IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>                      **Plaintiff,**<br><br>                      v.<br><br>**SCOTT JEFFREY MASON, RUBICON WEALTH MANAGEMENT, LLC, and ORCHARD PARK REAL ESTATE HOLDINGS LLC,**<br><br>                      **Defendants.** | **Civil Action No. 2:25-cv-00292**<br><br>**Jury Trial Demanded** |

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "SEC" or "Commission") alleges as follows against defendants Scott Jeffrey Mason ("Mason"), Rubicon Wealth Management, LLC ("Rubicon"), and Orchard Park Real Estate Holdings LLC ("Orchard Park" and together with Mason and Rubicon, "Defendants"):

## SUMMARY

1. This action concerns a multimillion-dollar scheme Mason orchestrated through two entities that he owned and controlled—Orchard Park, and formerly SEC-registered investment adviser Rubicon—to defraud at least 13 Rubicon clients and misappropriate their money.

2. Mason and Rubicon provided investment advisory services to their clients.

3. From at least 2016 until in or about April 2024, Mason transferred certain Rubicon clients' funds to Orchard Park and misappropriated them rather than invest the funds as promised.

4. From at least the late 2000s until in or about June 2024, Mason provided "concierge" services to one client and abused this access to that client's accounts by transferring millions of dollars from that client's accounts to accounts Mason controlled.

5. Mason used the money he misappropriated for various unauthorized purposes including to: purchase a share of a miniature golf course; partially pay back other clients; and pay personal expenses such as country club dues and credit card debt.

6. During the period from 2014 into 2024 (the "Relevant Period"), through and together with Rubicon and Orchard Park, Mason misappropriated more than $20 million in client funds before his scheme unraveled at the end of the Relevant Period.

## **VIOLATIONS**

7. By engaging in the conduct this Complaint describes Defendants violated Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Mason and Rubicon further violated Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(1) & 80b-6(2)].

8. Defendants will engage in the acts, practices, transactions, and courses of business set forth in this Complaint, or in acts, practices, transactions, and courses of business of similar type and object, unless the Court restrains and enjoins them.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

9. The Commission brings this action pursuant to Exchange Act Sections 21(d) [15 U.S.C. § 78u(d)] and 21(e) [15 U.S.C. § 78u(e)] as to all Defendants, and pursuant to Sections 209(d) and 209(e) of the Advisers Act [15 U.S.C. §§ 80b-9(d), (e)] as to Mason and Rubicon.

10. The Commission seeks a final judgment: (a) permanently enjoining Defendants from violating Section 10(b) of the Exchange Act or Rule 10b-5 thereunder, and further permanently enjoining Mason and Rubicon from violating Sections 206(1) and 206(2) of the Advisers Act, by engaging in the acts, practices, transactions, and courses of business alleged in this Complaint; (b) ordering Defendants to disgorge on a joint-and-several basis ill-gotten gains they received as a result of the violations this Complaint alleges, and to pay prejudgment interest pursuant to Exchange Act Sections 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(5) and 78u(d)(7)]; (c) ordering Defendants to pay civil penalties pursuant to Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)] and, as to Mason and Rubicon, pursuant to Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)]; and (d) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

11. This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), (e) and 78aa], and Sections 209(d), 209(e), and 214 of the Advisers Act [15 U.S.C. §§ 80b-9(d), (e), 80b-14].

12. Venue is proper in the Eastern District of Pennsylvania pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa] and 28 U.S.C. § 1391, and Section 214 of the Advisers Act [15 U.S.C. § 80b-14] as to Mason and Rubicon. The Defendants reside, may be found, or transact business in the Eastern District of Pennsylvania, and certain of the acts, practices,

transactions, and courses of business constituting the violations of the federal securities laws alleged in this Complaint occurred within this District.

## DEFENDANTS

13. **Scott Jeffrey Mason**, age 66, is a resident of Gladwyne, Pennsylvania. Mason previously held Series 7, 24 and 63 securities licenses, and was associated with investment adviser firms and/or broker-dealers registered with the Commission, including Rubicon. Mason was Rubicon's President and managing member during the Relevant Period and became Rubicon's Chief Compliance Officer in 2016. He was also an investment adviser representative with Rubicon and gave Rubicon clients investment advice in exchange for fees during the Relevant Period. He was thus an investment adviser under Advisers Act Section 202(a)(11) [15 U.S.C. § 80b-2(a)(11)].

14. **Rubicon Wealth Management, LLC**, is a Pennsylvania limited liability company based in Blue Bell, Pennsylvania and was an investment adviser firm registered with the Commission during the Relevant Period. Mason was Rubicon's sole owner during the Relevant Period by virtue of Mason's sole ownership and control of Rubicon's parent company, Rubicon Holdings Inc. ("Rubicon Holdings"), a Pennsylvania corporation.

15. **Orchard Park Real Estate Holdings LLC**, is a Pennsylvania limited liability company based in Gladwyne, Pennsylvania. Mason formed Orchard Park in or around June of 2016 to operate and maintain rental properties in Geneva, New York. Mason owned and controlled Orchard Park during the Relevant Period including between in or about June of 2016 through 2024.

# FACTS

**I.  Mason Controlled Rubicon and Orchard Park**

16. Mason owned and controlled Rubicon and Orchard Park throughout the Relevant Period. He directed every aspect of both entities' operations and exercised sole decision-making authority for Rubicon and Orchard Park.

17. Mason controlled Rubicon's bank and brokerage accounts throughout the Relevant Period.

18. Mason also controlled Orchard Park's bank accounts throughout the Relevant Period.

**II.  Rubicon's Investment Advisory Business**

19. In its Form ADV filed in March of 2024, Rubicon reported having roughly 115 investment-advisory clients and $231 million in assets under management.

20. Rubicon custodied client funds in accounts at certain trust and brokerage companies, including Trust Company A and Brokerage A.

21. Rubicon also managed certain client investments outside of Trust Company A and Brokerage A, including for certain bond, hedge fund, and venture capital investments.

22. Rubicon had discretion to trade in the accounts of certain Rubicon advisory clients, including in client accounts custodied at Trust Company A and Brokerage A, pursuant to wealth management agreements between Rubicon and those clients.

23. Throughout the Relevant Period, Rubicon and Mason owed their advisory clients an affirmative fiduciary duty of utmost good faith.

**III.     Mason Misappropriated Rubicon Client Funds**

24.     In violation of his and Rubicon's duties to their clients as investment advisers and in violation of the federal securities laws, Mason began making unauthorized transfers of client funds to Orchard Park for his own benefit in or about 2016.

25.     Throughout the Relevant Period, Mason typically funded such transfers by selling client securities holdings in their advisory accounts at Trust Company A and Brokerage A. He then wired the proceeds to Orchard Park.

26.     Mason frequently commingled clients' funds after he transferred them from his clients' advisory accounts at Trust Company A and Brokerage A to Orchard Park by further transferring them between and among Orchard Park's, Rubicon's, and his own bank accounts.

27.     Trust Company A and Brokerage A both required client consent before permitting the transfer of funds from clients' advisory accounts to external accounts such as Orchard Park's accounts.

28.     Mason circumvented this requirement in two ways. In certain instances, Mason falsely represented that his clients had consented to such transfers. Mason thus sometimes forged client signatures on account paperwork purporting to authorize such transfers.

29.     In other instances, Mason obtained client consents under false pretenses. For certain clients, Mason misrepresented the purpose of the transfers. Those clients authorized Mason to withdraw funds from their accounts based on Mason's misrepresentations to them.

30.     For example, Mason represented to certain clients that he would withdraw funds from their accounts at Trust Company A or Brokerage A to invest on their behalf in bonds or other third-party investments that were not custodied at those firms.

31.     These investments were fictitious. Mason instead used these funds for unauthorized purposes, including for his own investments and to pay personal expenses.

32. After such transfers, Mason also created false and misleading Rubicon account statements purporting to reflect clients' third-party investments with labels such as "Orchard Park RE," "OPRE" and "OP Real Estate."

33. These account statements were fictitious, however, and the entries labeled to indicate Orchard Park investments did not reflect any actual investments Mason or Rubicon had made on their clients' behalf.

34. Mason recommended that at least one client ("Client A") invest in Orchard Park, which Mason falsely represented was an investment fund that bought and sold mortgages.

35. In or about September of 2020, Client A authorized a $1.25 million transfer from the client's Rubicon account at Brokerage A to an Orchard Park account Mason controlled.

36. Mason misappropriated these funds and did not invest them as he represented he would to Client A.

37. Orchard Park later paid Client A approximately $50,000 in "interest" on this purported Orchard Park investment, at times using funds taken from at least one other Rubicon client.

38. Mason also prepared a fictitious Orchard Park account statement that listed a false Buffalo, New York address for Orchard Park, and contained figures purporting to show Client A's investment amount and one interest payment.

39. This account statement was false and misleading, however, as Mason had simply misappropriated Client A's funds for his own use.

**IV.  Mason and Rubicon Misappropriate Funds From Their "Concierge" Client**

40. In or around the late 1990s, a certain Rubicon client ("Client B") entered into an agreement with Rubicon and Mason to receive both investment advisory services and

7

"concierge" services that included paying Client B's bills, checking his mail, and managing his day-to-day expenditures.

41. Client B agreed to pay Rubicon one fee for both investment advisory and concierge services.

42. Client B gave Mason access to Client B's Rubicon advisory accounts as well as Client B's personal bank and other financial accounts so that Mason and Rubicon could perform investment advisory and concierge services for Client B without his involvement.

43. Mason and Rubicon abused this access to Client B's accounts. Starting in or around the late 2000s and continuing until in or about June of 2024, Mason and Rubicon transferred millions of dollars from Client B's accounts to accounts Mason controlled, including his personal accounts and various Rubicon and Orchard Park accounts. Many of these transfers were unauthorized and/or exceeded the amounts Client B legitimately owed to Mason and/or Rubicon.

44. Mason used funds he misappropriated from other Rubicon clients to partially reimburse Client B and conceal Mason and Rubicon's misappropriation of Client B's funds.

45. Mason also ignored Client B's directions concerning Client B's investments and the use of Client B's money.

46. For example, in or around 2019, Client B directed Mason to create a brokerage account for a family trust, and to fund the account with securities from Client B's brokerage account. Mason told Client B he had created the trust account as Client B had directed. Mason had not. Instead, Mason fabricated account statements and other documentation relating to the trust account for Client B and later claimed to have transferred the account to a different brokerage firm. In fact, the trust account never existed.

47. Client B suffered a substantial loss as a result of the Defendants' conduct.

## V.     Mason's Rubicon Scheme Collapses

48. Mason transferred more than $20 million in Rubicon client funds to himself, Rubicon, and Orchard Park during the Relevant Period.

49. Mason depleted these funds through various unauthorized uses such as payments for Mason's personal investments and expenses and payments to clients with other clients' funds.

50. Among other things, Mason used Rubicon client funds to purchase a partial ownership in a miniature golf course in New Jersey, pay off his personal credit cards and other debt, and pay his country club dues.

51. In or about the spring of 2024, one of Rubicon and Mason's clients ("Client C") asked Mason to explain certain transfers from Client C's advisory account to Orchard Park.

52. In particular, Client C inquired about transfers totaling over $3.2 million from Client C's advisory account to Orchard Park between 2019 and 2023.

53. Mason had in fact misappropriated Client C's money for his own use.

54. To conceal this, Mason falsely represented to Client C that Orchard Park was a vehicle Mason used to invest Client C's money in a short-term bond fund.

55. Mason provided Client C with a fictitious Rubicon account statement purporting to show the client's investment in this bond fund.

56. Mason then transferred to Client C at least $162,500 he misappropriated from at least one other Rubicon client as a purported "interest payment" from these fictitious bond investments.

57. Nevertheless, Client C directed Mason to return the funds in these supposed bond investments to the client's Rubicon advisory account at Trust Company A.

9

58. Mason did not do so because he had already used the money for his own benefit.

59. In connection with this dispute, Trust Company A became aware that Mason had transferred funds out of Rubicon client accounts without authorization and terminated its relationship with Rubicon.

60. Brokerage A then also terminated its relationship with Rubicon.

61. Defendants all directly or indirectly made use of the means and instrumentalities of interstate commerce or of the mails in connection with the acts, transactions, practices, and courses of business alleged in this Complaint.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**
**(Against All Defendants)**

62. The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1-61.

63. By engaging in the conduct described above, Defendants, directly or indirectly, by use of the means or instruments of interstate commerce or of the mails, or the facility of national securities exchanges, in connection with the purchase or sale of securities, knowingly or recklessly:

    a. employed devices, schemes, or artifices to defraud;

    b. made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or

    c. engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person in connection with the

purchase or sale of any security.

64. By reason of the foregoing, Defendant violated and, unless enjoined, will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 [17 C.F.R.§ 240.10b-5], thereunder.

### SECOND CLAIM FOR RELIEF
### Violations of Sections 206(1) and 206(2) of the Advisers Act
### (Against Defendants Mason and Rubicon)

65. The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 61.

66. By engaging in the conduct described above, Defendants Mason and Rubicon, knowingly or recklessly or, with respect to subpart (b), below, negligently, as investment advisers, directly or indirectly, by use of the means or instrumentalities of interstate commerce or of the mails:

   a. employed devices, schemes, or artifices to defraud any client or prospective client;

   b. engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon any client or prospective client.

67. By reason of the foregoing, Defendants Mason and Rubicon violated, and, unless enjoined, will continue to violate, Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1), (2)].

### PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a final judgment:

**I.**

Permanently restraining and enjoining Defendants from, directly or indirectly, engaging in conduct in violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

**II.**

Permanently restraining and enjoining Defendants Mason and Rubicon from, directly or indirectly, engaging in conduct in violation of Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. § 80b-6];

**III.**

Ordering Defendants to disgorge all ill-gotten gains or unjust enrichment derived from the activities set forth in this Complaint, together with prejudgment interest thereon, on a joint-and-several basis;

**IV.**

Ordering Defendants to pay civil penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], as well as pursuant to Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9] as to Defendants Mason and Rubicon; and

## V.

Granting such other and further relief as this Court may deem just, equitable, or necessary in connection with the enforcement of the federal securities laws and for the protection of investors.

Respectfully submitted,

Dated: January 17, 2025

s/Spencer Willig
Spencer Willig (N.Y. Bar No. 4897443)
Norman P. Ostrove
Gregory R. Bockin
Brian P. Thomas
Laura E.L. Gavin
Securities and Exchange Commission
Philadelphia Regional Office
1617 JFK Boulevard, Suite 520
Philadelphia, PA 19103
(215) 597-3100
WilligS@sec.gov